UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TATIANA LEIBEL, | Case No. 2:23-cv-00691-GMN-DJA |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254** |
| v. | |
| WARDEN REUBART, et al., | [ECF No. 5] |
| Respondents. | |

Petitioner Tatiana Leibel, a Nevada prisoner who is serving a 12-to-30-year sentence for the Second-Degree Murder of her husband, has filed a *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 5 ("Petition").) This matter is before this Court for adjudication of the merits of the Petition. In her sole ground for relief, Leibel alleges that new evidence shows that she is innocent. (ECF No. 5.) For the reasons discussed below, this Court denies the Petition.

I.  **BACKGROUND**

  A.   **Factual Background**[1]

Douglas County Sheriff's Office Deputy Steven Haley testified that on February 23, 2014, at approximately 11:00 a.m., he was dispatched to a home in Zephyr Cove, Nevada, on a report of a self-inflicted gunshot wound. (ECF No. 19-17 at 6.) After Deputy Haley arrived at the house and Leibel answered the door, Deputy Haley found a man, later identified as Harry Leibel (hereinafter "Harry"), lying on the floor in the living room. (*Id*. at 8.) According to Deputy Haley, "a rifle type weapon [was] sitting on the sofa" near Harry's body, and Harry did not appear to be

---

[1] This Court makes no credibility findings or other factual findings regarding the truth or falsity of the evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issue presented in the case.

"someone [who] was just shot." (*Id.* at 8–9.) Tahoe Douglas Fire District Paramedic Justin Reddig testified that upon entering the house, Harry "was real gray and ashy-colored," "he had a through-and-through [gunshot wound] to the left hand," and he was pulseless. (ECF No. 19-18 at 25–26.)

Douglas County Sheriff's Office Deputy Brandon Williamson arrived at the scene shortly after Deputy Haley. (ECF No. 19-18 at 12.) When Leibel answered the door, it appeared to Deputy Williamson that she was "somewhat panicked and possibly hyperventilating." (*Id.*) After Harry was pronounced dead, Deputy Williamson had a conversation with Leibel, who spoke "with a heavy Russian accent." (*Id.* at 11, 14.) Leibel told Deputy Williamson the following:

> [S]he was planning on taking a trip to Los Angeles that day to see her daughter and Harry and her were arguing over the issue. He didn't want her to go. She said that that morning she had planned on leaving. They both had gotten out of bed. He had come out to the living room with the firearm. She offered to make him breakfast and did so. After he was done eating, she tried to speak to him about her wanting to go Los Angeles today. He became very upset and they began arguing. She said that she went back in to [sic] the kitchen and she heard a gunshot. She then returned to the living room and saw Harry [sitting on the couch] holding the firearm towards [his] torso and that she covered her eyes and then he fired again.

(*Id.* at 11.) Leibel told Deputy Williamson that she called 911 "approximately five minutes" after Harry shot himself. (*Id.*) The 911 dispatcher told Leibel "to move Harry to the floor," so Leibel "moved the gun on to the floor and then pulled Harry on to the floor" and then "moved the gun from [the] floor [back] to the couch." (*Id.* at 12.) When Deputy Williamson told Leibel that Harry was dead, she "covered her face with her hand and began hyperventilating." (*Id.* at 14.)

Tahoe Douglas Fire District Captain Chris Lucas testified that Harry—in addition to being shot in his left hand—had been shot "on his right side just under his armpit." (ECF No. 19-18 at 16, 18.) Captain Lucas did not have the paramedics start resuscitation efforts because Harry "had been dead for a little while" based on the "pooling" of the body, "the fact that the blood that was around him had congealed," and his assessment that there were already signs of rigor mortis. (*Id.*

2

at 18–19.) Captain Lucas ordered that a heart rate monitor be hooked up to Harry to look for electrical activity in his heart. (*Id.* at 18.) According to the heart rate monitor, "there was no electrical activity in the heart." (*Id.* at 19.) From Captain Lucas's experience, he "would expect to see some electrical activity . . . 15 minutes" after a gunshot wound. (*Id.*)

Captain Lucas also testified that the hammer on the rifle was cocked, meaning it was ready to be discharged for a third time. (*Id.* at 20.) Leibel told Captain Lucas that she was outside when she heard the two gunshots, and although Captain Lucas "got the impression that she meant outside-outside," he testified that he could have been mistaken because "Leibel's accent was pretty thick." (*Id.* at 20, 24.) According to Captain Lucas, Leibel's "emotional state was consistent with somebody who just witnessed their spouse commit suicide." (*Id.* at 24.)

Douglas County Sheriff's Office Investigator Edward Garren testified that the rifle was inspected and investigators "were able to determine that the first round was shot through [Harry's] right torso and the second shot came through [his] left hand." (ECF No. 19-18 at 54.) It was later determined that the sole latent fingerprint found on the rifle could not be attributed to either Leibel or Harry. (ECF No. 19-20 at 18.)

Washoe County Medical Examiner Dr. Piotr Kubiczk testified that he performed the autopsy on Harry, who was 65-years old at the time of his death. (ECF No. 19-20 at 27, 29.) According to Dr. Kubiczk, "[t]here [was] no soot, no gunpowder particles or gunpowder stippling present on [Harry's] skin surface," which "indicate[d] that this [was] not a contact gunshot wound." (*Id.* at 30.) However, because Harry "was wearing clothing that could have stopped the . . . unburned gunpowder particles from reaching the skin surface," Dr. Kubiczk concluded that that Harry's cause of death and gunshot wound range—whether it was an intermediate range or a distant range—were both indeterminable. (*Id.* at 30.)

Mathew Noedel, a ballistics expert, testified that there was no stippling on Harry's right arm, "and if his arm [had been] close enough to the side of the firearm at the cylinder gap, he [would have gotten] marked." (ECF No. 19-25 at 13, 18.) According to Noedel, Harry was approximately two to six inches from the muzzle at the time of the first shot to his torso. (*Id*. at 24.) The second shot then perforated Harry's hand, eclipsed his left shoulder, and "continued into and through the couch, out the back of the couch and into the wall." (*Id*. at 26.) To a reasonable degree of scientific certainty, Noedel testified that it was his opinion that Harry did not commit suicide. (*Id*. at 28.)

Ralph Burach, Harry's "closest and dearest friend," testified that "Harry was a member of the Jewish faith" and "was very well-versed on Kabbalah." (ECF No. 19-25 at 5–6.) According to Burach, under Harry's religious views, suicide was "[t]otally unacceptable." (*Id*. at 6.)

Contrary to Leibel's statements to Deputy Williamson that she was in the room when Harry fired the two shots, Lee Ann Brooks, a friend of the Leibels, testified that Leibel gave her the following explanation the evening of the shooting:

> That her and Harry were arguing over her going to [sic] on a trip to L.A. to see her daughter, and that he had a gun he'd been carrying around for the weekend. And when she did not take her flight that I guess she supposedly had booked on Saturday, and on Sunday morning, she told him that she was going to go anyway. And she left the room, went into the kitchen and she heard a gun go off.

(ECF No. 19-25 at 42–43.)

Dr. Bennet Omalu, an expert in forensic pathology, testified for the defense that "this case is suicide, atypical that resembles homicide." (ECF No. 19-27 at 5, 8.) In coming to that conclusion, Dr. Omalu reviewed "the autopsy, toxicology reports, crime lab reports, . . . police reports," autopsy pictures, and the crime scene pictures. (*Id*. at 9.) Dr. Omalu also concluded that (1) Harry had not been dead for a long time before the paramedics arrived, (2) contrary to the

findings in the autopsy, the wounds to Harry's hand and torso were "loose contact" wounds because soot was apparent on Harry's body in the autopsy photographs, (3) the gunshot wound to Harry's torso would not have been immediately fatal, meaning "[h]e could have survived that wound for up to five to ten minutes" and engaged in other activities like shooting himself a second time and cocking the rifle for a third shot, (4) the second shot to Harry's hand was a misfire, and (5) there was evidence that Harry was suffering from hepatic encephalopathy, which, when combined with the marijuana that was found during Harry's toxicology, meant "there [was] no reasonable degree of certainty [for law enforcement] to rule [Harry's death] a homicide." (*Id*. at 11, 13, 15, 18, 25.)

### B.     Procedural Background

The jury found Leibel guilty of Second-Degree Murder with The Use of a Deadly Weapon. (ECF No. 19-30 at 2.)  On April 21, 2015, the Ninth Judicial District Court for Douglas County ("state court") entered a Judgment of Conviction, sentencing Leibel to 10 to 25 years for the Second-Degree Murder conviction plus a consecutive term of 2 to 5 years for The Use of a Deadly Weapon enhancement. (ECF No. 19-47 at 3.)  Leibel appealed, and the Nevada Supreme Court affirmed on December 18, 2015. (ECF No. 27-18.)

On November 14, 2016, Leibel filed a state Petition for Post-Conviction Relief. (ECF No. 34-1.)  The state court denied Leibel post-conviction relief on December 20, 2018. (ECF No. 22-2.)  Leibel appealed, and the Nevada Supreme Court affirmed on June 24, 2020. (ECF No. 22-26.)  Remittitur issued on July 20, 2020. (ECF No. 22-27.)

On November 9, 2020, Leibel filed a second state Petition for Post-Conviction Relief. (ECF No. 22-30.)  The state court denied Leibel post-conviction relief on January 22, 2021. (ECF No. 30-14.)  Leibel appealed, and the Nevada Supreme Court affirmed on December 17, 2021. (ECF

1  No. 34-36.)  After denying a Motion for Reconsideration and a Motion for *En Banc*
2  Reconsideration, remittitur issued on February 7, 2022. (ECF No. 34-44.)

3  On March 21, 2022, Leibel filed a third state Petition for Post-Conviction Relief. (ECF No.
4  33-24.)  The state court denied Leibel post-conviction relief on June 6, 2022. (ECF No. 25-4.)
5  Leibel appealed, and the Nevada Supreme Court affirmed on February 16, 2023. (ECF No. 25-16.)
6  After denying a Motion for Rehearing and a Motion for *En Banc* Reconsideration, remittitur issued
7  on May 9, 2023. (ECF No. 25-25.)

8  Leibel commenced this federal habeas action on May 2, 2023. (ECF No. 1.)  In her sole
9  ground for relief, Leibel raises a "due process claim of actual innocence based on newly discovered
10 evidence." (ECF No. 5 at 3.)  Respondents filed a Motion to Dismiss the Petition, arguing that (1)
11 an actual innocence claim is not cognizable in federal habeas, (2) the Petition is untimely, and (3)
12 the actual innocence claim is unexhausted and/or procedurally defaulted. (ECF No. 20.)  This
13 Court made the following findings in denying the Motion to Dismiss: (1) cognizability and the
14 actual-innocence gateway would be more appropriately addressed in connection with the merits of
15 the Petition, and (2) Leibel's claim was exhausted and not procedurally defaulted. (ECF No. 43.)
16 Respondents answered the Petition on February 20, 2024, and Leibel replied on March 13, 2024.
17 (ECF Nos. 47, 48.)

18 **II.    GOVERNING STANDARDS OF REVIEW**

19 28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus
20 cases under the Antiterrorism and Effective Death Penalty Act:

21 > An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
22 > was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim –
23

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id*. (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III. DISCUSSION

Leibel alleges that she is innocent of Second-Degree Murder based on the following newly discovered evidence: (1) crime scene photographs, showing the movement of furniture in the room where Harry was shot, (2) documentation that the rifle had been moved by responders and had the presence of unknown DNA, and (3) the fact that law enforcement never verified her cellphone activity records. (ECF No. 5.)

### A.   Standard for a Freestanding Actual Innocence Claim

The Supreme Court has not yet recognized a freestanding "actual innocence" claim as a constitutional claim. *See, e.g.*, *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *but see Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable."). However, if a freestanding actual innocence claim is cognizable, to be successful on such a claim, a petitioner would be required to show "a truly persuasive demonstration of 'actual innocence.'" *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (explaining that "the threshold showing for such an assumed right would necessarily be extraordinarily high"); *see also Jackson v. Calderon*, 211 F.3d 1148, 1164 (9th Cir. 2000) (noting that "a majority of the Justices in *Herrera* would have supported a claim of free-standing actual innocence"). This "contemplates a stronger showing than insufficiency of the evidence to convict" or "doubt about his guilt." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997). Under these standards, a petitioner must "affirmatively prove that he is

probably innocent." *Id.* In assessing whether a petitioner has met this standard, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 555 (2006) (internal quotation marks omitted).

### B. State Court Determination

Leibel raised her actual innocence claim during her second state habeas proceedings, and the Nevada Supreme Court affirmed the denial of relief on that claim. (*See* ECF No. 34-36 at 2.) In that decision, the Nevada Supreme Court stated the following:

> Appellate further did not demonstrate actual innocence to overcome application of the procedural bars because she did not identify any new evidence, and consequently, did not show that "it is more likely than not that no reasonable juror would have convicted [her] in light of . . . new evidence." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (internal quotation omitted); *see also Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001), *abrogated on other grounds by Rippo v. State*, 134 Nev. 411, 423 n.12, 423 P.3d 1094, 1097 n.12 (2018). . . . And appellant's petition to establish factual innocence failed to identify any new evidence that would clearly establish her factual innocence. NRS 34.930 (defining newly discovered evidence).

(ECF No. 34-36 at 2–3.) Additionally, in her third state habeas appeal, the Nevada Supreme Court explained the following:

> The actual innocence gateway to reach the merits of a procedurally barred claim requires that Leibel show that "it is more likely than not that no reasonable juror would have convicted [her] in light of . . . new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. In other words, she must show that she is factually innocent. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). As new evidence of her innocence, Leibel proffered photographs of the crime scene and autopsy and a news article regarding the prosecutor's seeking a judgeship. But these materials have previously been presented to the court and thus do not constitute new evidence. And although Leibel relies on these materials to dispute the sufficiency of the evidence presented at trial, none of them provide a basis for us to conclude that no reasonable juror would have convicted Leibel in light of this information. *Cf. Brown v. McDaniel*, 130 Nev. 565, 576, 331 P.3d 867, 875 (2014) (distinguishing actual innocence and insufficient evidence claims). Further, insofar as Leibel argues factual innocence,

> the materials proffered do not constitute "[n]ewly discovered evidence" to support a petition to establish factual innocence because the materials were previously available. *See* NRS 34.930 (defining the term). . . . The district court therefore did not err in rejecting Leibel's actual innocence claims . . . .

(ECF No. 25-16 at 3–4.)

### C. Analysis

The Nevada Supreme Court reasonably concluded that Leibel's materials do not constitute newly discovered evidence. First, regarding the movement of the furniture, Leibel contends that photographs of the crime scene show that "the end table and coffee table [were] moved from their original location to a location that created the space in between to physically allow the access needed to commit the crime." (ECF No. 48 at 5.) In support of this contention, Leibel included a diagram of the living room, which was originally prepared by law enforcement and showed the coffee cable moved out of the way of the couch, but she has drawn in the "original location" of the coffee table directly in front of the couch. (ECF No. 6 at 3.) Leibel also included crime-scene photographs showing the coffee table moved to the side, which allowed the prosecution to imply that the coffee table did not obstruct her access to Harry, who was located on the couch when he was shot. (*See* ECF No. 6-2 at 79.) And Leibel included crime-scene photographs showing that the end table that had been sitting adjacent to the couch had been moved to just outside the living room. (*See* ECF No. 6-2 at 71, 73, 75.) Because these photographs were taken at the crime scene by investigators, they are not new evidence.[2] And regarding the diagram of the living room, Leibel's addition of the "original location" of the coffee table does not amount to new evidence.

---

[2]Notably, even if the jury did not see the specific photographs Leibel now expresses were important, there was testimony at the trial that the paramedics moved a table to attend to Harry. (*See* ECF No. 19-17 at 9.)

10

Leibel's knowledge of the coffee table's placement at the time Harry was shot was available at the time of her trial.

Second, regarding the rifle, Leibel appears to contend that "the state actors [acted] in concert" with each other to cast suspicions on her by moving and manipulating the rifle, which is shown by the presence of four unknown DNA contributors on the rifle. (ECF No. 48 at 7.) To support this contention, Leibel included four crime-scene photographs depicting the rifle in various positions. (*See* ECF No. 6-2 at 91, 93, 95, 97.) Notably, according to Leibel, only three of those photographs show the hammer on the rifle in a cocked position. (*See id*.) Because these photographs were taken at the crime scene by investigators, they are not new evidence. Regarding the unknown DNA contributors, Washoe County Sheriff's Office Crime Lab Criminalist Jennifer Naranjo testified at the trial that she processed the rifle and determined that "there were at least four individuals who their DNA would be associated with" the swabs she took of the rifle's strap but that she was unable to make any conclusions due to the DNA being "low level." (ECF No. 19-20 at 14–15.) Accordingly, the unknown DNA contributors on the rifle are also not new evidence.

Third, regarding the verification of her cellphone activity records, Leibel appears to argue that the device that extracted and reported on the information from her cellphone was never verified and that Investigator Garren's testimony about her cellphone records was erroneous. (*See* ECF No. 6-1 at 6–7.) Specifically, regarding the latter argument, Leibel contends that the original records showed that her outgoing text message to her daughter on the day of Harry's death was sent at 10:56 a.m., rather than at 9:56 a.m., as Investigator Garren testified.[3] (*Id*. at 7.) Even if Investigator Garren interpreted Leibel's cellphone records incorrectly, which is not apparent

---

[3] For context, Leibel's call to 911 was made at 11:03 a.m., and her text message to her daughter stated, "I'm still home. . . . I have [an uncomfortable] situation. I [will] explain [a] little bit later." (ECF No. 19-18 at 42.)

because those records do not appear in the record before this Court, Leibel's cellphone records are not new evidence. Investigator Garren testified at the trial that he used an "extraction device" to retrieve information from Leibel's cellphone. (ECF No. 19-18 at 40.) That "extraction device" generated a report of the data from Leibel's cellphone, and that report was admitted as evidence at Leibel's trial. (*Id*. at 40–41.) If Leibel desired to dispute the reliability of that generated report at trial, she had the ability to cross-examine Investigator Garren with her actual cellphone records.

Even assuming, *arguendo*, that Leibel's materials constitute new evidence, the Nevada Supreme Court also reasonably concluded that Leibel failed to demonstrate that she is actually innocent. The issue at Leibel's trial was whether Harry committed suicide or whether Leibel shot him. Based on the record, this Court appreciates that Leibel presented compelling expert testimony that Harry's death was the result of an atypical suicide. However, importantly, the jury did not accept Dr. Omalu's opinion. And although the "new" evidence that Leibel provides certainly could amount to an increased doubt as to the cause of Harry's death, especially when consider in combination with Dr. Omalu's testimony, the "new" evidence does not rise to the level of showing that Leibel "is probably innocent," *Carriger*, 132 F.3d at 476, when considered in the context of the overall record.

First, a showing that the coffee table was located directly in front of the couch—rather than at the outer reaches of the couch—during the shooting would negate a finding that Leibel was the shooter because she would have had difficulty accessing Harry, who was shot at a close range on the couch, due to the presence of the coffee table. Regardless of this limited accessibility issue, Leibel fails to show that she is probably innocent. Not only was the rifle a long weapon, avoiding the need for Leibel to be standing directly in front of Harry to be the shooter, but also the reliability of this evidence is questionable given that the coffee table's placement directly in front of the

couch is only supported by Leibel's self-serving statement. *See Carriger*, 132 F.3d at 476 (explaining that a freestanding claim of actual innocence must be based on reliable evidence).

Second, a showing that responders manipulated the rifle so that the hammer was in a cocked position—rather than Harry having done so in his incapacitated state under Leibel's narrative—would have supported Leibel's contention that Harry committed suicide. Despite this support, Leibel again fails to show that she is probably innocent. Dr. Omalu testified that the gunshot wound to Harry's torso would not have been immediately fatal, meaning he was capable of shooting himself a second time and cocking the rifle for a third shot. Given that Leibel already presented evidence that she did not cock the rifle—instead asserting that it was Harry—she fails to show that evidence that one of the responders may have cocked the rifle would have made a difference in the jury's verdict.

Third, a showing that Leibel texted her daughter about an uncomfortable situation seven minutes before she called 911—rather than one hour and seven minutes before she called 911—would have potentially belied the prosecutor's argument that he believed Leibel shot Harry long before she called 911 and sent her daughter the text message about "the uncomfortable situation" between shooting Harry and calling 911. (*See* ECF No. 19-28 at 4.) Regardless of the availability of this rebuttal argument, Leibel fails to show that she is probably innocent. The text message was fairly innocuous. In fact, because Leibel explained that she and Harry were having a fight before the shooting, "the uncomfortable situation" text could simply have been referring to the tension in the house prior to the shooting.

In sum, while Leibel's "new" evidence could have benefited her defense that Harry committed suicide, the "new" evidence would not have demonstrated that she is probably innocent. As David C. Billau, a forensic science consultant who testified for the defense, explained at the

trial, "if you manipulate evidence, then obviously you're going to come up with various answers." (ECF No. 19-26 at 11, 23–24.) Leibel's "new" evidence may have cast doubt on the prosecution's given narrative, but changing the perspective surrounding the coffee table's location, rifle positioning, and cellphone records would only have allowed for various new narratives. It would not have affirmatively proven Leibel's narrative. *See House*, 547 U.S. at 555 (rejecting freestanding actual innocence claim even though the petitioner had "cast considerable doubt on his guilt"); *Carriger*, 132 F.3d at 477 ("Although the postconviction evidence he presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove Carriger's innocence."); *Jackson*, 211 F.3d at 1165 (rejecting a freestanding actual innocence claim even though the petitioner's new evidence "certainly cast doubt on his conviction"); *Jones*, 763 F.3d at 1251 ("The most that can be said of the new testimony is that it undercuts the evidence presented at trial[, but e]vidence that merely undercuts trial testimony or casts doubts on the petitioner's guilt . . . is insufficient to merit relief on a freestanding claim of actual innocence."); *Taylor v. Beard*, 811 F.3d 326, 334 (9th Cir. 2016) ("Taylor would not have been able to vacate his felony murder conviction because at best he has established that the jury relied on an incorrect theory, not that he was factually innocent of the crime."); *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) ("Gimenez's 'new' evidence doesn't undermine the prosecution's case so much as beef up the theory that the jury already rejected").

Thus, even if (1) a freestanding actual-innocence claim is cognizable in non-capital habeas proceedings, and (2) Leibel can pass through the actual-innocence gateway to avoid the untimeliness of her Petition, Leibel has not presented "a truly persuasive demonstration of 'actual

innocence.'" *Herrera*, 506 U.S. at 417. Accordingly Leibel's request for federal habeas relief is denied.

## IV. CERTIFICATE OF APPEALABILITY

This is a final Order adverse to Leibel. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability. This Court has *sua sponte* evaluated Leibel's actual innocence claim within her Petition for suitability for the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Applying these standards, this Court finds that a Certificate of Appealability is not warranted.

## V. CONCLUSION

It is therefore Ordered that the Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 [ECF No. 5] is denied.

It is further Ordered that a Certificate of Appealability is denied.

It is further Ordered that the Clerk of Court enter Judgment and close this case.

Dated:  March 28, 2024

_____
Gloria M. Navarro, Judge
United States District Court